UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


RICHARD D. NELSON, AS TRUSTEE :          NO. 1:09-CV-00750
OF PETRO ACQUISITIONS, INC.   :
                              :
        Plaintiff,            :
    v.                        :          **ORDER AND OPINION**
                              :
                              :
WALNUT INVESTMENT PARTNERS,   :
L.P., et al.,                 :
                              :
        Defendants.           :


        This matter is before the Court on Plaintiff's Motion for
Summary Judgment (doc. 12), Defendant's Motion in Limine to Exclude
Expert Report and Opinions of Richard Ferguson (doc. 13),
Defendant's Motion for Summary Judgment (doc. 14) and the
respective responses and replies (docs. 16, 18, 19, 20, 22, 25).
For the reasons that follow, the Court DENIES Defendant's Motion in
Limine (doc. 13), DENIES in part and GRANTS in part Defendant's
Motion for Summary Judgment (doc. 14) and DENIES in part and
GRANTS in part Plaintiff's Motion for summary judgment (doc. 12).

**I.  Background**

        Plaintiff is the court-appointed bankruptcy trustee for
Petro Acquisitions, Inc. ("Petro") and its subsidiaries (doc. 14).
Petro was the parent company of several related entities and
wholly-owned subsidiaries that operated more than fifty and
franchised roughly eighty convenience stores and gas stations
primarily in Ohio and Kentucky (doc. 12).   Defendant Walnut

Investment Partners, L.P. is an investment fund that, in 2000, invested $5,000,000 in Petro and, in exchange, received a minority 45% interest, or 450 Preferred Shares, in Petro (doc. 14). Under the January 2000 Shareholder Agreement between Petro and Walnut, Petro was required to repurchase Walnut's investment in three payments beginning in February 2005 (Id.).

However, in early 2004, the parties modified the redemption schedule, with Petro to provide a $1,000,000 payment on May 18, 2004; a $1,750,000 payment on June 30, 2005; a $2,500,000 payment on June 30, 2006; a $2,750,000 payment on June 30, 2007; and a $750,000 final payment on June 30, 2007 (Id.). As part of this modification process, Don Bloom, Petro's CEO, prepared a company valuation, and Petro's Board of Directors approved the modification (Id.).

Petro never fully complied with its redemption obligations. On the contrary, Petro submitted five payments to Defendant totaling $2,750,000 plus interest before Petro filed a voluntary bankruptcy petition on November 21, 2007 (Id.). The first payment of $1,000,000 was transmitted upon the execution of the May 2004 modification agreement (Id.). The second payment was due on June 30, 2005, and was not timely made, and Petro informed Defendant that it did not have the funds to make the payment (Id.). After months of discussions, Petro provided Defendant with a letter signed by CEO Bloom, COO Tony Parnigoni and CFO Bill Zembrodt,

-2-

which, in relevant part, noted that the check for $1,000,000 that had been delivered to Defendant on August 26, 2005, could be deposited at any time because the funds were "legally available," came about from the sale of certain non-performing assets, and Petro had received a waiver of defaults from another lender (Id.). At that time, COO Parnigoni confirmed that Petro was making its senior debt obligations and that no bank had declared default (Id.).

Because the payment made in August and accepted in September 2005 was $750,000 less than what was scheduled to be paid on June 30, 2005, Petro made three payments in 2006 toward that deficiency: on March 14, 2006, Petro paid $100,000; on March 30, 2006, $275,000 plus interest; and on November 17, 2006, $375,000 plus interest (Id.). These were the last payments received by Defendant from Petro (Id.).

Plaintiff filed suit against Defendant in May 2008, alleging that the payments made by Petro to Defendant were either made at a time when Petro was insolvent or the payments rendered Petro insolvent and/or Petro was or became in default of its loan agreements at the time the payments were made or as a result of the payments (doc. 1). Specifically, in Counts I and II, Plaintiff alleges that Petro's redemption payments were made in violation of Ohio Revised Code § 1701.35(B)(prohibiting corporations from purchasing own shares under certain conditions) and Ohio Revised

-3-

Code §§ 1336.04 and 1336.05 (fraudulent transfer) (<u>Id</u>.). Pursuant to 11 U.S.C. § 544, Plaintiff contends in Count III that he may avoid the transfer of money to Defendant because it was made in violation of state law, so Plaintiff is entitled to recover the value of those payments for the bankruptcy estate for the benefit of all creditors (<u>Id</u>.). In addition, in Count IV, Plaintiff contends he is entitled to avoid those payments pursuant to 11 U.S.C. § 548, because the payments were either made with the intent to hinder, delay or defraud or because Petro received less than a reasonably equivalent value in exchange and was insolvent or became insolvent as a result of the transfer (<u>Id</u>.). In Count V, Plaintiff claims he is entitled to have the transfer avoided and preserved for the estate's benefit, pursuant to 11 U.S.C. § 551 (<u>Id</u>.).[1]

## II. The Motion in Limine to Exclude Expert Report & Opinions

Defendant moves to exclude the report and all opinions offered by Plaintiff's business valuation expert Richard Ferguson on the basis that he failed to employ a reliable methodology to reach his conclusions (doc. 13, citing Fed. R. Evid. 702; <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993)). Defendant has asked the Court for a <u>Daubert</u> hearing on this matter, but the Court finds a hearing on the issues presented by

---

[1] The Court notes that Plaintiff voluntarily dismissed Count VI, a director liability count, and Defendants John Does 1-10, leaving Defendant Walnut the sole remaining Defendant in this matter (doc. 1).

-4-

Defendant's Motion to Exclude would not assist the Court in its decision and declines the request for a hearing.  For the reasons that follow, the Court denies Defendant's motion.

### A.    The Admissibility Standard

Defendant challenges the admissibility of Plaintiff's expert under Rule 702 of the Federal Rules of Evidence and <u>Daubert</u>, 509 U.S. 579.  Rule 702 governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

The trial judge must act as a gatekeeper, admitting only that expert testimony that is relevant and reliable.  <u>Daubert</u>, 509 U.S. at 589.  With regard to scientific knowledge, the trial court must initially determine whether the reasoning or methodology used is scientifically valid and is properly applied to the facts at issue in the trial.  <u>Id</u>.  To aid the trial court in this gatekeeping role, the Supreme Court has listed several key considerations: 1) whether the scientific knowledge can or has been tested; 2) whether the given theory or technique has been published or been the subject of peer review; 3) whether a known rate of error exists;

and 4) whether the theory enjoys general acceptance in the particular field. Id. at 592-94. The Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595. "[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995).

Although Daubert centered on the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based on specialized or technical, as opposed to scientific, knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999). The trial court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. The trial judge enjoys broad discretion in determining whether the factors listed in Daubert reasonably measure reliability in a given case. Id. at 153. The party proffering the expert testimony bears the burden of showing its admissibility under Rule 702 by a preponderance of the evidence. Daubert, 509 U.S. at 592 n.10.

**B. Discussion**

Defendant is not challenging the qualifications of

-6-

Plaintiff's expert Ferguson.  Instead, Defendant contends that Ferguson "employed an entirely unreliable methodology in calculating the value" of Petro and relied on his subjective analysis and assumptions to reach his opinions rather than the testimony of Petro representatives (doc. 13).  Specifically, Defendant argues that the Court should disallow Ferguson's testimony because, it contends, Ferguson did not consult with company management to develop the facts he needed to conduct his analysis; he did not inspect the physical properties at issue; he did not consider the impact of current and future market forces on Petro's future cash flow; he did not use reliable data to calculate the "small-stock premium" used to compute Petro's future cash flow; he based his calculation of the company-specific risk premium used to compute Petro's cash flow on only his subjective opinion; he did not use the correct cost-of-debt data to calculate Petro's cash flow; he did not use the correct metric in analyzing Petro's capital structure; and he based his valuation of specific company assets like accounts receivable and amounts due from franchisees on only his subjective opinion (Id.).

In contrast, Plaintiff contends that Ferguson is highly qualified in business valuation and used a "well-recognized and scientifically accepted methodology" and argues that his testimony should be allowed because the criticisms made by Defendants go to the weight, not the admissibility, of Ferguson's testimony (doc.

16).   In short, Plaintiff contends this is a question of "reasonable minds" disagreeing, which cannot be the basis for excluding Ferguson's opinions (Id.).

As an initial matter, in the Court's view Daubert liberalized the admission of expert testimony beyond the previous Frye general acceptance test.   As such, when expert testimony meets Daubert criteria, it can be admitted and given whatever weight a trier of fact might accord such testimony.   As noted above, the trial court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.

Here, the Court finds nothing in the record to suggest that Ferguson did not employ "the same level of intellectual rigor" to forming his opinion at issue as he would have absent this litigation.  Defendant makes much of Ferguson's article "The 'Dirty Dozen' Mistakes When Using a Valuation Expert."  Specifically, Defendant asserts that Ferguson's failure to speak to Petro's owners or to inspect the physical locations of the property at issue is evidence that his report was based on unreliable methodology since, in his article, he writes that "it is malpractice if you do a business valuation and do not talk to the owner of the business...[or] if you do not go out and see the

-8-

physical location of the business." The Court has read the article in its entirety and finds that, in context, those statements are not as damning as Defendant would have the Court find them. The article is geared towards family law attorneys using valuation experts in divorce cases, and in the context of assessing the present value of a business that is owned by the opposing party in a divorce, the Court can certainly understand the importance of the valuation expert having access to information that can only come from the business owner or from a physical inspection of the business.

Of course, the context here is quite different. Ferguson was asked to assess the value of Petro at a specific time in the past. He was provided with extensive written material, which he consulted, and, in his opinion, speaking with the owner, who is apparently responsible for leading Petro to its downfall, would provide no reliable information. Similarly, he opted not to visit the physical location of the property at issue, a visit that would necessarily have occurred years after the point in time he was asked to assess. The Court can find nothing that, pursuant to Rule 702 or <u>Daubert</u> or any other authority, would require the exclusion of Ferguson's report merely because he made some hyperbolic statements in an article that was exploring valuation issues in a context entirely different from the one present here.

In any event, as <u>Daubert</u> and its progeny make clear,

-9-

there are no bright-line rules regarding experts. Even if Ferguson actually believes that failure to interview the business owner in every context during every valuation constitutes malpractice, the Court is not required to ignore his opinion on the basis of that failure.

Regarding Defendant's other contentions, the Court finds that they go to the credibility, rather than the admissibility, of the report. For example, Defendant argues that Ferguson's use of the 10b$^2$ size category in his assessment of the small stock premium for his calculations is indicative of the unreliability of his methods because, according to the expert retained by Defendant to rebut Ferguson's report, the "data contained in 10b is fraught with problems" (doc. 13). Defendant's expert quotes Shannon Pratt and Roger Grabowski for the proposition that using 10b overstates the size premium, which, Defendant's expert contends, leads to an undervaluation of the company (Id.). However, Plaintiff notes that Defendant's own expert relies on the same authority to assess the small stock premium but chose to use the 10a size category instead of the 10b used by Ferguson (doc. 16). Because he used a

---

² Because investment in small companies is typically riskier than investment in large companies, when determining the cost of equity in a small company, one approach is to assign a value to that risk—a small stock risk premium. 10b refers to a category of size premiums for smaller companies. Others include the 10th decile and categories 10a and 10w and x and 10 y and z. The difference among the categories can vary by several percentage points.

recognized authority, Plaintiff argues, Ferguson's opinion should not be excluded and the Court should, instead, look at the choice to use 10b over 10a as a matter of professional difference not as a basis to exclude evidence.

The Court agrees with Plaintiff here. Plaintiff asserts that 10b is an acceptable, reliable data source and points to authority for that assertion, and Defendant asserts that it is not, pointing to authority for that assertion. In such cases, the question becomes whose expert, whose reasoning, is more persuasive, which is fundamentally a question of credibility not of reliability. This is equally true for Defendant's assertions that Ferguson did not use the correct cost-of-debt data to calculate Petro's cash flow and that he did not use the correct metric in analyzing Petro's capital structure. Ferguson clearly made judgment calls that Defendant disagrees with, but that does not mean his methods were unreliable. See, e.g., In re Scrap Metal Antitrust Litigation, 527 F.3d 517, 529 (6th Cir. 2008)(finding "garbage in, garbage out" argument unpersuasive because "it fundamentally confuses the credibility and accuracy of [the expert's] opinion with its reliability"); Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1343-44 (11th Cir. 2003)(rejecting argument that expert's testimony should be excluded because expert used incorrect or missing data and wrong equations, because such assertions go to the weight, not admissibility, of

evidence).

Defendant makes much of some statements Ferguson made in deposition testimony, contending that he admitted that he based his calculation of the company-specific risk premium used to compute Petro's cash flow and his valuation of specific company assets like accounts receivable and amounts due from franchisees on only his "subjective opinion." Based on such statements, Defendant argues, the Court must find his report unreliable because the statements amount to proof that his opinion was based on guesses or speculation. Defendant asserts that this as a simple case: Ferguson's report has only one real underpinning–his own _ipse dixit_–and it cannot survive a _Daubert_ challenge.  This is an oversimplification of the record before the Court.  While it is true that Ferguson did testify that he came to use certain numbers based on his subjective opinion, he also testified that he arrived at those numbers based on a thorough review of Petro's financial records, minutes from board meetings, memoranda drafted by COO Parnigoni, and other documents.  This qualifies as "some support," which takes Ferguson's opinion out of the realm of speculation. _See_ _In re Scrap Metal_, 527 F.3d at 530.  To assert that the numbers he chose to employ in his calculations were mere speculation or guesses is belied by the record as a whole.

Rejection of expert testimony is the exception, not the rule, _id._, and Defendant has not shown that the extraordinary step

of rejecting Ferguson's report is warranted.  For the foregoing reasons, therefore, Defendant's Motion in Limine to Exclude Expert Report and Opinions of Richard Ferguson (doc. 13) is denied.

**III.     The Motions for Summary Judgment**

    **A.     The Summary Judgment Standard**

       A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also, e.g., <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464 (1962); <u>LaPointe v. United Autoworkers Local 600</u>, 8 F.3d 376, 378 (6th Cir. 1993); <u>Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs.</u>, 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam).  In reviewing the instant motion, "this Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Fatton v. Bearden</u>, 8 F.3d. 343, 346 (6th Cir. 1993), <u>quoting</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 251-252 (1986) (internal quotation marks omitted).

       The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and non-movant are well settled.  First, "a party seeking

summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Garino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1982); Street v. J.C.D. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Shaeffer & Ebeling Co. L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere

-14-

existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies." Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); United States v. Diebold, Inc.,

369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. See Matsushita, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454–455 (6th Cir. 1991).

**B. Discussion**

The cross-motions for summary judgment essentially rest on one fundamental question: does a genuine issue of fact exist with respect to whether Petro was either insolvent at the time it made the redemption payments to Defendant or rendered insolvent by those payments? Unsurprisingly, Plaintiff asserts that it was insolvent or made insolvent by the payments, and Defendant contends it was not. Although this is a fundamental issue in this case, it is not dispositive of every claim. Therefore, the Court must look through the lens of each of the specific claims to determine if summary judgment is proper for any of the claims with respect to each of the payments at issue.

**1. Count I: The Stock Redemption**

In Count I, Plaintiff alleges that Petro's redemption

-16-

payments were made in violation of Ohio Revised Code § 1701.35(B), which reads in relevant part, "A corporation shall not purchase...or redeem its own shares if immediately thereafter its assets would be less than its liabilities plus its stated capital, if any, or if the corporation is insolvent, or if there is reasonable ground to believe that by such purchase or redemption it would be rendered insolvent." Plaintiff asserts that "[i]mmediately after each redemption [of stock], Petro's assets were less than its liabilities plus stated capital" and that "Petro's creditors were not paid amounts which they should have been paid prior to any payments" to Defendant (doc. 1). "Insolvent" in this context means that "the corporation is unable to pay its obligations as they become due in the usual course of its affairs." Ohio Rev. Code § 1701.01 (O). The Court notes the disjunctive in the redemption statute: a corporation may not redeem its shares <u>either</u> if its assets would be less than its liabilities plus stated capital <u>or</u> if it would be or is unable to pay its debts as they normally come due. Ohio Rev. Code § 1701.35(B).

        **a.   Was Petro Insolvent or Rendered Insolvent or Were Petro's Liabilities Greater Than its Assets?**

        **i.  The May 18, 2004 Payment: $1,000,000**

Using the balance sheet test, Ferguson determined that the fair value of Petro's assets was less than its liabilities by between $2,332,596 and $5,406,982, as of the time of Petro's first

payment to Defendant.  Utilizing the discounted cash flow method[3],
he determined that, as of May 19, 2004, the fair value of Petro's
assets was less than its liabilities by $1,200,000.  Thus, by
either test, Ferguson determined that Petro was insolvent at the
relevant time, as its liabilities were greater than its assets.

In addition, Plaintiff notes that two weeks prior to
making the first payment, Petro had a positive cash balance of
$900,000, and zero outstanding on its line of credit but three
months later, on August 13, 2004, it no longer had a positive cash
balance and had drawn $1,200,000 on its line of credit, reflecting
a cash flow difference of $2,100,000 from two weeks before the
payment to three months after.  Additionally, Plaintiff notes that
COO Parnigoni's weekly report for the week of August 13, 2004,
reported that Petro was running $1,000,000 in cash flow below where
it needed to be going into the winter.  And, by December 3, 2004,
Petro had a line of credit balance of $3,600,000, compared with a
positive cash balance of $2,400,000 the year before.  Further, in
March 2005, Petro was out of covenant on two loans because it was
below the fixed charge coverage ratio (which compares debt to

---

[3]  The balance sheet test requires that the fair value of
the company's assets, including intangible assets such as
goodwill, be compared to the liabilities of the company.  The
discounted cash flow method rests on an assumption that the
purchaser of an income-producing asset will not pay more than the
present value of the cash flows projected to be generated by the
asset.

operating income) required by two of its lenders[4], and by April 2005, Petro had extended the aging of its accounts payable. These facts, Plaintiff contends, show that the first payment Petro made to Defendant violated Ohio law because, at the time the payment was made, Petro's assets were less than its liabilities, and, because Petro was $1,000,000 behind where it needed to be in cash flow going into the winter after making the $1,000,000 payment to Defendant, it was not able to pay its debts as they became due.

Defendant notes that COO Parnigoni testified, however, that Petro was never declared in default on any of its loans, that it was paying debt, vendors and banks, and that it had options available to it to generate cash such as, e.g., selling off certain assets (doc. 14). Defendant also observes that COO Parnigoni was consulted about Petro's ability to make the May 2004 payment, and that CEO Bloom, also Petro's majority shareholder, approved the payment (Id.). Finally, Defendant notes that Petro's independently audited financial statements for the year ending 2004 show that assets exceeded liabilities by $1,890,000, and Petro had almost $8,000,000 in shareholder equity after the May 2004 payment was made (Id.).

---

[4] To be "out of covenant" on a loan means that the borrower is not in compliance with certain terms in the loan agreement. Typically, if a borrower is out of covenant, the lender may consider the borrower to be in default, and the lender has the right to demand full payment. Here, Petro's loans had a requirement of a certain fixed charge coverage ratio. Petro was not in compliance with that required ratio.

While financial statements can be useful in assessing the financial viability of an entity, they are not dispositive on the issue of solvency.  See, e.g., In re Sleepy Valley, Inc., 93 B.R. 925, 928, n. 4, n. 5 (Bankr. W.D. Tex 1988)(noting, for example, that generally accepted accounting principles require that assets are typically valued at book value or at cost and not at fair market value thus rendering balance sheets non-dispositive on solvency issues); In re Art Shirt Ltd., Inc., 68 B.R. 316, 322 (Bankr. E.D. Pa. 1986).  Here, the Court does not find the financial statements to be compelling evidence of solvency because they do not reflect the fair market value of all of Petro's assets at the times in question and, instead, reflect merely the book value of the assets.  Plaintiff's expert Ferguson determined the fair market value of Petro's assets, including goodwill, at the relevant times and concluded that the fair value of Petro's assets was less than its liabilities, thus rendering Petro insolvent.  On the other hand, as Plaintiff notes, neither Defendant nor Defendant's expert, Jeffrey Risius, conducted such an analysis. This essentially leaves Ferguson's analysis and conclusion uncontroverted.  Absent a thorough analysis of the company's fair market value of its assets compared to its liabilities, Defendant is not able to create a genuine issue of fact as to Petro's insolvency merely by pointing to the company's financial statements.

-20-

COO Parnigoni's deposition testimony, when read as a whole, does not create a genuine issue of fact with respect to Petro's insolvency either. While he did testify that Petro was never declared in default on any of its loans and that it had options available to it to generate cash such as, e.g., selling off certain assets, he also testified that Petro was out of covenant on two of its loans and that it found it necessary to extend the aging on its accounts payable in order to service its debts. In addition, the fact that Petro had assets it could have sold is not dispositive on the issue of solvency any more than independent financial statements are, and for similar reasons. The question is not what the book value of the assets were at the time, which is the essential point of the statement that Petro had assets it could have sold—that the company had X assets with a book value of Y which theoretically could be sold. Instead, the question is what the fair market value of those assets was at the time, which requires an analysis of what a willing and prudent buyer would have paid for each asset in a fair market. Regardless of whether COO Parnigoni thought the company had assets it could have lived without or could have sold to generate cash, the reality is that the value of those assets for the purposes of a solvency analysis is not their book value or the assertion on the part of a company officer that they "could have been sold," but their fair market value, and, again, only Ferguson provided a conclusion on this

point.

Defendant also observes that COO Parnigoni was consulted about Petro's ability to make the May 2004 payment, and that CEO Bloom approved the payment, but that is an insufficient fact to create a genuine issue as to Petro's insolvency as it does not prove either the company's actual ability to pay its debts as they came due or on the company's fair market value of its assets compared to its liabilities.

On the other hand, Plaintiff has adduced evidence showing that Petro was insolvent or rendered insolvent at the time of its first payment to Defendant. Specifically, Plaintiff has presented the analysis of his expert to show that Petro was insolvent utilizing both the balance-sheet and the discounted cash flow method, as its assets were less than its liabilities. In addition, Plaintiff has shown that Petro was out of covenant, though admittedly not declared in default, on two of its loans and that it was unable to pay its accounts payable debts as it had been prior to making the first payment to Defendant, thus demonstrating its inability to service its debts as they came due. Using either of the definitions of insolvency present in Ohio Rev. Code § 1701.35(B), the Court finds that Petro was insolvent or rendered insolvent by the $1,000,000 stock redemption payment made to Defendant on May 18, 2004, in violation of Ohio law.

### ii. The Subsequent Payments

-22-

From its first stock redemption payment onward, Petro's financial position only worsened. Petro remained maxed out on its line of credit, continued to be out of covenant on the two loans and had an ever-worsening cash-flow situation. Just before the second payment was due, COO Parnigoni submitted a letter to Petro's board stating that making the second payment on time would be impossible because of the company's cash flow condition, that any cash generated by a recent sale of certain assets was needed to come current on terms with Petro's main grocery supplier, and that each of Petro's lenders had expressed concern about the impending stock redemption payment to Defendant, worried that the payment could significantly impede Petro's ability to pay on its loans and could lead to default. At that time, COO Parnigoni indicated that Petro had only $100,000 in legally available funds to pay towards the scheduled redemption, which check was refused by Defendant because of concerns about the company's financial health. The parties renegotiated the redemption payment schedule, and on September 29, 2005, Petro informed Defendant that the $1,000,000 check they had negotiated could be deposited because the company had legally available funds to back the check. This back-and-forth of a demand for redemption payments, the company responding with a statement of inability to pay, a renegotiation of the schedule, and an eventual partial payment continued through the ensuing year. Ultimately, Petro secured a high-interest loan in order to make

what ended up being its last payment to Defendant, on November 17, 2006. A year later, the company filed for relief under Chapter 11 of the Bankruptcy Code.

Defendant relies again on the audited financial statements to support its position that Petro was solvent at the time of these subsequent payments. Further, Defendant offers assurances made by Petro's officers that the second $1,000,000 payment–the one deferred until the end of September 2005–was made with legally available funds. Those assurances were made after Petro secured a waiver of default from its lenders, and the money used to make the redemption payment, according to COO Parnigoni, came from the sale of certain non-performing assets. Defendant argues that even if the company was not in the position to legally make the agreed-upon payment in June or July of 2005, by the time the check was deposited at the end of September that year, the funds were there. With respect to the payments made in 2006, Defendant notes that Petro made an affirmative representation of solvency when it applied for and received the high-interest loan and that the loan documents specifically provided for the $375,000 payment Petro made to Defendant in November 2006.

The Court finds that Defendant has not created a genuine issue of fact with respect to Petro's insolvency during the time Petro made the stock redemption payments in 2005 and 2006. Plaintiff has adduced evidence in the form of deposition

-24-

testimonies, authenticated weekly reports and expert testimony that shows that Petro was unable to pay its debts as they came due and that its assets were less than its liabilities during the times in question. Defendant's reliance on affirmative statements made by Petro officers to the contrary is misplaced, whether such statements were made in the high-interest loan application or in the letter to Defendant in 2005 indicating that the second payment was being made with "legally available funds." The expressed opinion of the officers making the statements, under the circumstances in which they were expressed, does not change the fact that the company was not paying its debts as they came due, was out of covenant on certain loans, was forced to seek a waiver of default, and had liabilities greater than assets.

Defendant asserts that, even if Petro was insolvent at the relevant times, in order to succeed on his claim, Plaintiff must show that Defendant knowingly received each redemption payment in violation of the law (doc. 25, citing Ohio Revised Code § 1701.95(D)). Section 1701.95 provides, "A shareholder who knowingly receives any dividend, distribution, or payment made contrary to law or the articles shall be liable to the corporation for the amount received by that shareholder that is in excess of the amount that could have been paid or distributed without violation of law or the articles." Defendant argues that failure to satisfy the "knowingly" component of section 1701.95 precludes

-25-

a finding of liability under section 1701.35, the statute governing the permissibility of stock redemptions, under which Plaintiff seeks relief.  For support, Defendant cites <u>Waste Management, Inc. v. Danis Industries Corp.</u>, 2004 WL 5345389 (S.D. Ohio, Feb. 24, 2004), where Judge Rice, in a piercing-the-corporate-veil case, described section 1701.95 as providing "an express remedy for violations of section 1701.35(B)."

However, this assertion is unavailing.  Count I seeks a recognition of liability for the violation of section 1701.35, not 1701.95.  The Court has found that Plaintiff has shown such a violation because Petro redeemed its own shares at a time when its assets were or would be less than its liabilities plus its stated capital or when it was insolvent or there was reasonable ground to believe that the redemption would render it insolvent.  The question of whether, pursuant to 1701.35, Plaintiff is entitled to recoup the approximately $2,000,000 that he seeks need not be answered by the Court because the money is due Plaintiff by virtue of Count III, where Plaintiff seeks, under the Bankruptcy Code, to avoid the payments made on the basis that they were made in violation of state law.  The violation of state law occurred when the company impermissibly redeemed its stock in violation of section 1701.35.  The impact of section 1701.95 on violations of section 1701.35, therefore, need not be resolved by the Court here, although the Court notes that nothing in Ohio's statutory scheme

-26-

requires a finding of "knowingly" under section 1701.95 before a finding of liability under section 1701.35 can be found. To the extent Judge Rice's opinion in <u>Waste Management</u> can be read to compel a different result, the Court simply respectfully disagrees with that reading. Judge Rice was confronted with significantly different facts, and he did not speak to the interplay between section 1701.35 of the Ohio Revised Code and the federal Bankruptcy Code.

Even if Defendant's reading is correct, that the only way a trustee in bankruptcy can recoup stock redemption payments made in violation of the Ohio statute is if it is proved that the shareholder whose stock was redeemed knew the payment was being made in violation of the law, such a reading does not preclude a grant of summary judgment on Count I to Plaintiff. The Court finds that Defendant had ample information to be put on notice that redemption of its stock would either cause Petro to become insolvent or would be made at a time of insolvency. Plaintiff has adduced evidence–such as the multiple communications from COO Parnigoni to both Petro's board, where two of the four directors were controlled by Defendant, and to Defendant directly–indicating that Defendant was repeatedly informed of Petro's dire financial conditions but nonetheless insisted on the stock redemption anyway. <u>See</u>, <u>e.g.</u>, doc. 9-4, doc. 11-1. Defendant, holding two seats on the board, was in a position to intimately know the financial

condition of the company and cannot hide now from the knowledge it had then.  The mere disavowal of knowledge made in Defendant's briefings is simply insufficient to rebut the evidence adduced by Plaintiff.  Therefore, even if Defendant's reading of Ohio's statutory scheme is correct and liability under section 1701.35 can only be found if the "knowingly" component of section 1701.95 is also found, Plaintiff is still entitled to summary judgment on Count I.

The Court finds that Plaintiff has met his burden of showing no genuine issue of fact with respect to Petro's insolvency during the time that the stock redemption payments were made to Defendant and is thus entitled to summary judgment on Count I to the extent that count seeks to impose liability for a violation of Ohio Revised Code section 1701.35.  However, as Defendant notes, a finding of insolvency alone does not entitle Plaintiff to summary judgment on all of its claims, and the remainder of the claims are addressed below.

### 2.  Count II: Fraudulent Transfers

In Count II, Plaintiff claims that Petro's redemption payments constituted fraudulent transfers to Defendant in violation of Ohio Revised Code §§ 1336.04 and 1336.05.  In order to establish a violation of section 1336.04, Plaintiff must show either (1) that Petro made the transfers or incurred the obligation to make the transfers "[w]ith actual intent to hinder, delay, or defraud" any

-28-

of Petro's creditors or (2) that the transfers were made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation" and Petro "was engaged or was about to engage in a business or a transaction for which the remaining [Petro] assets were unreasonably small in relation to the business or transaction" or Petro "intended to incur, or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due."  Ohio Rev. Code § 1336.04(A).

To establish a violation of section 1336.05, Plaintiff must show that Petro was insolvent or would be made so by the redemption payments and that payments were made without receiving a reasonably equivalent value in exchange.  Here, the Court notes the conjunctive: both insolvency and lack of fair consideration must be proved.  To establish fraudulent conveyances under this section, neither Petro's intent nor Defendant's knowledge need be proven.  See Sease v. John Smith Grain Co., Inc., 479 N.E. 2d 284, 288 (Ohio Ct. App. 1984).

In his complaint, Plaintiff contends that the redemption payments were made with the actual intent to hinder, delay and/or defraud Petro's creditors because Walnut had insider knowledge of the precarious financial condition of the company, and Petro was insolvent or became insolvent shortly after the payments were made (doc. 1).  In the alternative, Plaintiff argues that Petro violated

-29-

section 1336.04 of Ohio's code by making payments without receiving a reasonably equivalent value in exchange when Petro was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small or Petro intended to incur or should have known it was incur debts beyond its ability to pay as they became due (Id.). However, in his motion for summary judgment, Plaintiff argues only insolvency and does not argue fraud. Indeed, even in Plaintiff's reply in support of his motion for summary judgment and in his response in opposition to Defendant's motion for summary judgment, while Plaintiff cites to Ohio's fraudulent conveyance laws, he points to no evidence in the record that would support the other prongs of Ohio's fraudulent conveyance laws; in fact, he does not discuss these prongs at all. This is fatal to Plaintiff's fraud claim because the statutes under which he seeks relief require a showing of both insolvency and either actual or constructive fraud. See Ohio Rev. Code §§ 1336.04 (requiring insolvency and a showing of actual intent to defraud or insolvency and a showing, e.g., that the transfers were made without receiving a reasonably equivalent value in exchange) and 1336.05 (requiring insolvency and a showing that payments were made without receiving a reasonably equivalent value in exchange). As a result, summary judgment for Defendant as to Count II is appropriate because Plaintiff has failed to adduce evidence of either actual or constructive fraud.

3.     **Counts III and IV: Avoidance and Recovery Under the Bankruptcy Code**

In Count III, Plaintiff argues that, pursuant to 11 U.S.C. § 544, he is entitled to avoid the redemption payments because the payments were made in violation of the applicable state laws referenced in Counts I & II.  Further, pursuant to 11 U.S.C. § 550, Plaintiff argues that he is entitled to recovery from Defendant, the transferee, the amount of the impermissible transfer made.  Defendant argues that Plaintiff is not entitled to avoidance and recovery under these sections because he has not shown a violation of the applicable state laws in Counts I and II.

Section 544(b)(1) of the Bankruptcy Code provides that Plaintiff "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law...."  11 U.S.C. § 544(b)(1).  Under section 550 of the Bankruptcy Code, in order to recover from the transferee (here, Defendant), the transfer must first be avoided (here, under section 544).  11 U.S.C. § 550.  Because the Court has found that the redemption payments made to Defendant were in violation of Ohio Revised Code section 1701.35, those payments are entitled, under 11 U.S.C. § 544, to be avoided.  Consequently, Plaintiff is entitled to recover the amount of the avoided transfer.

In Count IV, Plaintiff contends he is entitled to avoid the redemption payments pursuant to 11 U.S.C. § 548, which would allow Plaintiff to avoid any payment "that was made or incurred on

-31-

or within 2 years before [November 21, 2007], if [Petro] voluntarily or involuntarily [did so] with actual intent to hinder, delay, or defraud any entity to which [Petro] was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) received less than a reasonably equivalent value in exchange for [the payment]; and (ii)(I) was insolvent on the date that [the payment] was made..., or became insolvent as a result of [the payment]; or (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining [of Petro] was an unreasonably small capital; or (III) intended to incur, or believed that [it] would incur, debts that would be beyond [Petro's] ability to pay as such debts matured...." 11 U.S.C. § 548. Here, "insolvent" means that "the sum of [Petro's] debts [was] greater than all of [Petro's] property, at a fair valuation...." 11 U.S.C. § 101(32).

In his complaint, Plaintiff contends that he is entitled to relief under all facets of this section of the federal code (doc. 1). However, as above with Count II, the fraud count, Plaintiff did not argue or point to evidence in the record on actual and constructive fraud components of this count. Consequently, summary judgment for Defendant is proper as to Count IV.

## III. Conclusion

For the foregoing reasons, the Court DENIES Defendant's Motion in Limine (doc. 13); GRANTS summary judgment to Defendant as to Counts II and IV; and GRANTS summary judgment to Plaintiff as to Counts I and III.  The Court notes that, because the transfer is voidable under section 544 of the Bankruptcy Code, it is automatically preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code, which was the subject of Plaintiff's Count V.  Thus, Plaintiff is successful on that count as well.  Consequently, Plaintiff is entitled to recover the amount impermissibly transferred to Defendant and avoided under the Bankruptcy Code, or $2,750,000, plus applicable interest.

SO ORDERED.

Dated: July 13, 2011        s/S. Arthur Spiegel
                            S. Arthur Spiegel
                            United States Senior District Judge